**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHAO XIA "RENEE" ZHANG,<br>KIRKPATRICK and M&E INT'L, INC., | )<br>)<br>) | |
| Plaintiffs, | )<br>) | 1:13-cv-2023 |
| v. | )<br>)<br>) | Magistrate Judge Susan E. Cox |
| LAYER SAVER LLC, an Illinois limited,<br>liability company, CHARLES G.<br>KIOLBASA, JR., STEVE PIERSON and<br>SELDEN FOX, LTD., | )<br>)<br>)<br>)<br>) | |

## Order

Defendants Steve Pierson and Selden Fox, Ltd. ("Moving Defendants") filed a motion for summary judgment on Plaintiff's claims for federal securities fraud and common law fraud under Illinois law. In a previous order, this Court granted summary judgment in favor of Moving Defendants on the federal securities claim. For the reasons discussed more fully below, Moving Defendants' motion [dkt. 37] is denied on the common law fraud claim only on the issue of whether Moving Defendants Pierson and Selden Fox misrepresented that Defendant Layer Saver LLC had purchase contracts with Heinz and Tropicana, and did so with reckless disregard for whether that statement was true or false. Moving Defendants' motion is granted on all remaining issues.

Additionally, Plaintiffs Chao Xia "Renee" Zhang-Kirkpatrick ("Renee") and M&E International, Inc. ("M&E International"), have filed a motion for summary judgment on Renee's claim for breach of contract against Defendants Layer Saver LLC ("Layer Saver"), and Charles G. Kiolbasa, Jr. ("Kiolbasa"), and M&E International's claim against Layer Saver LLC, and

Kiolbasa seeking injunctive relief. For the reasons discussed more fully below, the Court will grant in part and deny in part the motion [dkt. 43] as it pertains to the breach of contract claim, and deny the motion for the injunction claim. Additionally, M&E International will be given 14 days to file a brief and any accompanying evidence necessary to explain why summary judgment in favor of Kiolbasa and Layers Saver on Count VI would be in appropriate. Layer Saver and Kiobasa will be given 7 days to respond to M&E International's brief.

## I. Background

For purposes of these cross motions for summary judgment, unless otherwise specified, we rely only those facts that are not disputed by either party. Renee has been an independent business woman for over 20 years with a bachelor's degree in finance, and has operated a Chinese restaurant and a scrap metal brokerage business. (Dkt. 42 at ¶ 1.) Moving Defendant Pierson is a Certified Public Accountant ("CPA") and a shareholder of the accounting firm Selden Fox; Selden Fox is also a Moving Defendant in this case. (*Id.* at ¶¶ 3-4.) Renee and Pierson have been friends for many years, and Renee often told Pierson that she was looking for investment opportunities. (*Id.* at ¶ 11.) According to Renee, Pierson often provided "professional advice and assistance," including once helping her "evaluate the soundness and viability" of an annuity contract that another person had brought to Renee. (Renee Aff. at ¶¶ 4-5.) However, Renee never signed an engagement letter with Pierson or Selden Fox to perform accounting services or investment advisory duties, never paid Selden Fox for any services performed, and used a different accountant to prepare tax returns for her and her businesses. (*Id.* at ¶¶ 12.)

Layer Saver is in the business of manufacturing, marketing, selling, and renting shipping frames; Kiolbasa is the manager of Layer Saver. (*Id.* at ¶¶ 5-6.) In 2011, Layer Saver engaged

Selden Fox to perform accounting services for Layer Saver, and Pierson became familiar with Layer Saver and Kiolbasa. (*Id.* at ¶ 13.) At some point before September 2011, Layer Saver began to experience financial difficulties. According to the Plaintiffs, Layer Saver owed Selden Fox approximately $20,000 in overdue fees and lost hundreds of thousands of dollars in 2010 and 2011. After these issues began to arise, Pierson and Kiolbasa discussed Layer Saver's need for additional financing, and whether Pierson might know any potentially interested investors. (*Id.* at ¶ 14.) In late 2011, Pierson called Renee, and, according to Renee, told her that Layer Saver would be a "great investment opportunity" for Renee. (*Id.* at ¶ 15.) Renee and Pierson then met to discuss the opportunity in person. (*Id.* at ¶ 16.) At her deposition, Renee testified that Pierson indicated that Layer Saver needed "some kind of bridge loan to basically run the company." (*Id.* at ¶ 17.)

Soon thereafter, Renee met with both Pierson and Kiolbasa to further discuss the possibility of Renee loaning money to Layer Saver. (*Id.* at ¶ 18.) At that meeting, Renee was shown a spreadsheet with columns labeled "Heinz" or "Tropicana," a future month, and various sales and costs numbers. (Renee Aff., Ex. 1.) Pierson and Selden Fox maintain that this document represented financial projections based on estimated sales that Layer Saver expected to make to Tropicana and Heinz. (Dkt. 42 at ¶ 18.) However, the document, despite showing future months, does not indicate that the figures in the document are simply projected sales – it does not include the words like "projected" or "future" or any disclaimers whatsoever. Renee claims that Pierson "represented to [Renee] that [the document] reflected contracted for purchase orders from Heinz and Tropicana," and that Layer Saver "had the purchase contracts from Heinz and Tropicana as set forth [in the document]." (Renee Aff. at ¶¶ 10, 13.)

At this meeting, the possibility of Renee providing Layer Saver with a short term loan in

the amount of $150,000 was discussed. (Dkt. 42 at ¶ 19.) Pierson expressed enthusiasm about Layer Saver and its future potential as a business, and Kiolbasa explained the details of the potential transaction. (*Id.*) According to Renee, Pierson failed to disclose that Layer Saver owed Selden Fox over $20,000 in unpaid fees, that Layer Saver had minimal sales and lost hundreds of thousands of dollars in 2010 and 2011. (Dkt. 41 at 12.)

Renee decided to go through with the transaction and lend $150,000 to Layer Saver. (Dkt. 42. at ¶ 21.) On January 3, 2012, Layer Saver, through Kiolbasa, and Renee executed a promissory note (the "Note") memorializing the transaction; the Note was for $150,000 and provided for an interest rate of 15 percent per annum, calculated and compounded monthly, with a maturity date of July 15, 2012. (*Id.* at ¶ 24.) The Note was secured by a pledge of the intellectual property in a patent application pending before the USPTO (the "Patent Rights"), which was owned by Kiolbasa. (*Id.*)

Pursuant to the Note, Layer Saver paid Renee $1,602.64 in January 2012, $1,862.96 in February 2012, $1,991.44 in March 2012, and $1,972.20 in April 2012; the Layer Saver and Kiolbasa maintain that these amounts represented payment on the principal on the Note, whereas Renee contends the payments were for interest accrued on the Note. (Dkt. 56 at ¶ 13.) These were the only payments that Layer Saver made on the Notes. (*Id.* at ¶ 14.) On July 12, 2012, Renee sent a demand letter to Kiolbasa and Layer Saver requesting payments of all amounts due and owing on the Note as of the maturity date (*i.e.*, July 15, 2012), which was then $154,524.54. (*Id.* at ¶ 15.) Having failed to pay Renee after the maturity date of the Note, Renee sent a default letter to Kiolbasa and Layer Saver on August 3, 2012; Layer Saver has not made any additional payments to date. (*Id.* at ¶¶ 17-18.) Renee claims that she is owed $277,302.01 -- $150,000 or principal, $62,398.85 in interest, and $62,160.00 in attorneys' fees; Layer Saver and Kiolbasa

assert that Renee's attorneys' fees are "patently unreasonable" and that Renee incorrectly compounded the interest due on the Note. (*Id.* at ¶ 19.) Layer Saver and Kiolbasa do not deny that the Note states that "[Renee] may also recover from [Layer Saver] all costs of suit and collection in connection therewith, together with reasonable attorneys' fees." (Dkt. 1, Ex. A.)

Renee also states that she sent Kiolbasa a letter on November 2, 2012, notifying Kiolbasa and Layer Saver that we was exercising her rights under the Note to foreclose on the Patent Rights pledged as security for the Note. (*Id.* at ¶ 20.) Renee further asserts that she and her attorney published notice of a public sale of the Patent Rights in the Chicago Tribune, and that she sold the Patent Rights to M&E International at a public sale for $10.00 on December 5, 2012. (*Id.* at ¶¶ 21-22.) Layer Saver and Kiolbasa deny that Renee had a valid, enforceable security interest to the Patent Rights. (*Id.*)

On March 15, 2013, Plaintiffs filed the instant suit. An amended complaint was filed on February 11, 2014, bringing causes of action for federal securities fraud against Kiolbasa and Layer Saver (Count I), common law fraud against Kiolbasa and Layer Saver (Count II), breach of contract against Layer Saver (Count III), federal securities fraud against Pierson and Selden Fox (Count IV), common law fraud against Pierson and Selden Fox (Count V), and "injunction" against Layer Saver (Count VI). (Dkt. 29.) On June 26, 2014, Moving Defendants filed their motion for summary judgment, seeking to have judgment entered in their favor on Counts IV and V of the Amended Complaint. (Dkt. 37.) On September 15, 2014, Plaintiffs filed their motion for summary judgment, seeking to have judgment entered in their favor on Counts III and VI. (Dkt. 43.)

On March 26, 2015 this Court granted summary judgment in favor of Selden Fox and Pierson on Count IV, holding that the Note did not fall within the definition of "security" under

the Securities and Exchange Act of 1934. (Dkt. 59.) As this left only state law claims, this Court withheld a decision on the common law fraud claim until the issue of supplemental jurisdiction could be resolved. On April 10, 2015, this Court exercised its discretion to retain supplemental jurisdiction in order to conserve judicial resources. (Dkt. 61.) Layer Saver and Kiolbasa filed a motion to dismiss for lack of supplemental jurisdiction, which was denied April 30, 2015. (Dkt. 63.) Therefore, the matters currently before this Court are Renee's motion in its entirety, and Moving Defendant Selden Fox and Pierson's motion on the common law fraud claim.

## II. Discussion

### A. Summary Judgment Standard

"On review of cross-motions for summary judgment, we view all facts and inferences in the light most favorable to the nonmoving party on each motion." *Wis. Alumni Research Found. v. Xenon Pharm., Inc.,* 591 F.3d 876, 882 (7th Cir.2010). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Lalowski v. City of Des Plaines*, 2015 WL 3756412, at *1 (7th Cir. June 17, 2015) (quoting Fed.R.Civ.P. 56(a)).

### B. Plaintiffs' Motion

#### 1. Count III – Breach of Contract

Although the precise calculation of damages cannot be determined on the motion before this Court, Plaintiffs' motion for summary judgment on the liability portion of the breach of contract claim is granted. Under Illinois law, which applies to the Note, Renee must establish: 1) the existence of a valid, enforceable contract, 2) performance by the Plaintiff, 3) breach of the contract by Layer Saver and Kiolbasa, and 4) resulting damages. *Razor Capital v. Antaal*, 972

N.E.2d 1238, 1247 (Ill. App. 2012). Layer Saver and Kiolbasa do not deny that the Note was a valid, enforceable contract or that Renee performed her duties pursuant to the Note. In fact, Layer Saver does not deny that it breached the Note, admitting that "Layer Saver . . . failed to make payments called for by the Promissory Note." (Dkt. 57 at 2.) Instead, they argue that the amounts they paid Renee between January and April 2012 were payments on the principal owed on the note, not accrued interest as Renee claims, and, therefore, the amount of principal owed – *i.e.*, the damages resulting from the breach – on the Note is unclear.

Layer Saver and Kiolbasa further contend that Renee failed to provide evidence to support the basis for the costs and fees she seeks. In other words, they are not denying that Renee was damaged by the breach of the Note; they are arguing that there is a genuine issue of material fact regarding *the amount* of damages that Renee suffered. This Court finds it difficult to believe that the payments that Layer Saver made were applied to the outstanding principal on the Note while interest continued to accrue; however, drawing all inferences in favor of Layer Saver and Kiolbasa as the non-moving parties, this Court must accept the possibility that their version of the facts is correct, and that the amount of Renee's damages is uncertain.

Nonetheless, this does not preclude this Court from entering summary judgment in favor of Renee on Count III of her Amended Complaint on the liability portion of that claim. There is no genuine issue of material fact regarding the elements necessary to establish a breach of contract claim. As such, Renee's motion is granted on Count III, with the amount of damages that Plaintiff suffered due to Layer Saver and Kiolbasa's breach to be determined at trial.

### 2. Count VI – Injunction

Plaintiffs' motion will be denied as to Count VI, because M&E International has failed to provide any evidence that a valid patent has been issued on the application embodied in the

Patent Rights. Count VI of the Amended Complaint alleges that "Kiolbasa and Layer Saver continue to use the Patent Rights in derogation of M&E's ownership interests in such Patent Rights by continuing to sell or offer for sale the Frames encompassing the Patent Rights." (Dkt. 29 at ¶ 78.) As noted above, the Patent Rights in this case concern a patent application; there is no evidence that any patent has been issued by the PTO on that application.

Patent rights, once issued, give the holder of the patent "the right to exclude others from making, using, offering for sale, or selling" the invention embodied in the patent in the United States. 35 U.S.C. § 154(a)(1). The term of those patent rights "begin[] on the date on which the patent issues." 35 U.S.C. § 154(a)(2). However, "[t]he inchoate right existing in an inventor, after making an application for a patent and while the same is undergoing an examination in the patent office, does not entitle him to injunctive relief against an infringer of such right." *Ressinger v. Sears Roebuck & Co.*, 62 F. Supp. 158, 160 (N.D. Ill. 1945); *see also, Plastic Recovery Technologies, Inc. v. Container Components, Inc.*, 2004 WL 2583951, at *1 (N.D. Ill. Nov. 12, 2004) (dismissing declaratory judgment action where no patent had issued at the time suit was filed).[1] In other words, a party who holds no more than the rights to a patent application cannot enjoin another party from using the technology that may be be embodied in that application, unless and until the patent is actually issued by the PTO.

Here, M&E International has failed to produce any evidence that the Patent Rights in the relevant patent application have been granted by the PTO. Simply proving that an application has been filed does not give M&E International the intellectual property right to enjoin Layer Saver from using the technology that *might* – but might not – be protected by a patent at some uncertain future date. As such, even assuming that the Patent Rights were properly foreclosed

---

[1] Although the Court does not reach the issue here, it is unclear whether Count VI even presents a justiciable case or controversy, as the specific rights that Plaintiff seeks to enforce are unclear until the PTO issues the patent. *See GAF Building Materials Cor. v. Elk Corp of Dallas*, 90 F.3d 479 (Fed. Cir. 1996).

upon by the Plaintiff,[2] the Plaintiff is not entitled to injunctive relief on a patent application that has not issued. Therefore, Plaintiff's motion will be denied as to Count VI.

In light of the discussion above, this Court is inclined to grant Kiolbasa and Layer Saver summary judgment *sua sponte* on Count VI. Pursuant to Federal Rule of Civil Procedure 56(f), the Court may grant summary judgment to a nonmovant, but only "[a]fter giving notice and a reasonable opportunity to respond." *See also, Hotel 71 Mezz Lender LLC v. National Retirement Fund*, 778 F.3d 593, 603 (7th Cir. 2015). "This includes the chance to marshal evidence and argument in opposition to summary judgment, even where, as here, the party has already sought and failed to obtain summary judgment in its favor." *Id.* As such, this Court will give M&E International 14 days from the entry of this order to file a brief, along with whatever accompanying evidence is required, explaining why summary judgment in favor of Kiolbasa and Layers Saver on Count VI would be inappropriate. Kiolbasa and Layer Saver will then have 7 days to file a reply brief. The Court will then take the issue under advisement and rule by mail. If additional oral argument is needed, the Court will contact the parties.

### C. Defendants' Motion

As this Court previous granted summary judgment in favor of Moving Defendants on the federal securities fraud claim, the only remaining issue on Moving Defendants' motion is Renee's cause of action for common law fraud against Moving Defendants. A cause of action for common law fraud in Illinois requires Renee to prove: 1) a false statement or omission of a material fact; 2) knowledge or belief by the maker that the statement is false; 3) an intention to induce the plaintiff to act; 4) reasonable reliance upon the truth of the statement by the plaintiff;

---

[2] The parties devoted portions of their briefs to the issue of whether the Patent Rights were properly transferred to the Plaintiffs under the procedures required by the Illinois Uniform Commercial Code. The Court need not, and does not, reach that issue in this opinion, as the claim for injunctive relief concerns a property right that is "inchoate," regardless of whether it rightfully belongs to Plaintiff or Layer Saver.

and; 5) damage to the plaintiff resulting from such reliance. *Lagen v. Balcor Co.*, 274 Ill.App.3d 11, 653 N.E.2d 968, 972 (1995). Renee claims that Pierson and Selden Fox, through Pierson, "misrepresented the facts of the Heinz and Tropicana supposed purchases, and failed to inform [Renee] of other facts that would clearly have been material to her decision to invest in the Note," such as Layer Saver owing Selden Fox $20,000 in fees, Layer Saver's poor sales record and weak financial condition. (Dkt. 41, at 12.) Moving Defendants argue that this Court should reject Renee's arguments because: 1) there is no evidence linking Selden Fox to the alleged fraud; 2) Moving Defendants did not owe Plaintiff a duty that would make them liable for omissions of material fact; 3) the alleged misrepresentations were opinions, not actionable statements of fact; and 4) there is no evidence to show that the Moving Defendants knowingly made any misstatements or omissions or material fact. For the reasons discussed more fully below, the Moving Defendants' motion will be granted in part, and denied in part.

### 1. Selden Fox's Liability for Pierson's Alleged Misrepresentations

Moving Defendants argue that Selden Fox cannot be held liable for Pierson's alleged misrepresentations because "[e]ven assuming everything Plaintiff alleges is true, Pierson was acting as Plaintiff's friend in recommending an opportunity that Pierson believed could be beneficial to Plaintiff," and, therefore, "there is no evidence that he was performing professional services in his capacity as a CPA for Selden Fox." (Dkt. 53 at 3.) Renee argues that Pierson's actions were within the scope of his apparent authority as a partner at Selden Fox.

Under the doctrine of respondeat superior, an employer can be held vicariously liable for the tortious acts of employees, "including negligent, wilful, malicious, or even criminal acts of its employees when such acts are committed in the course of employment and in furtherance of the business of the employer." *Davila v. Yellow Cab Co.*, 333 Ill. App.3d 592, 776 N.E.2d 720,

727 (2002). Thus, the issue turns on whether the act was within the "scope of employment," which has not been "precisely defined," but requires that the conduct of the employee: a) is the kind he is employed to perform; b) occurs substantially within the authorized time and space limits; and c) it is actuated, at least in part, by a purpose to serve the master." *Id.* "Only if no reasonable person could conclude from the evidence that an employee was acting within the course of employment should a court hold as a matter of law that the employee was not so acting," and the question "should be decided by a jury, unless the deviation is so great, or the conduct so extreme, as to take the servant outside outside the scope of his employment and make his conduct a complete departure from the business of the master." *Id.* at 727-28 (internal citations and quotations omitted). The case law reveals that this is a very high hurdle for the Moving Defendants to meet. *See Jones v. Patrick & Assocs. Detective Agency, Inc.*, 442 F.3d 533, 535-36 (7th Cir. 2006) (collecting cases).

Drawing all inferences in favor of the Renee, as is required at this stage of litigation, a reasonable person could conclude that Pierson was acting within the scope of his employment with Selden Fox. Pierson was the CPA for Layer Saver and intimately aware of its financial status. Additionally, according to Renee, some of the meetings between Pierson and Renee regarding the Note with Layer Saver took place at Selden Fox's offices. Moreover, it is not "a complete departure from the business" of Selden Fox for Pierson, as Layer Saver's CPA, to be called upon to issue statements to prospective investors or lenders regarding the fiscal health of Layer Saver. Therefore, the question of whether Pierson was acting within the scope of his employment during the meetings with Renee should be left to the jury and summary judgment will be denied on this basis.

2. **Pierson Did Not Have a Special Trust Relationship With Renee**

In addition to the elements listed above, a plaintiff seeking to prove fraud based on an omission of material fact (*i.e.*, fraudulent concealment) must also "show the existence of a special or fiduciary relationship, which would raise a duty to speak." *Weidner v. Karlin*, 402 Ill.App.3d 1084, 1087, 932 N.E.2d 602, 606 (2010). A duty to disclose arises where "'plaintiff and defendant are in a fiduciary or confidential relationship' or in a 'situation where plaintiff places trust and confidence in a defendant, thereby placing defendant in a position of influence and superiority over the plaintiff.'" *Wigod v. Well Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012) (quoting *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 675 N.E.2d 584, 593 (1996)). Fiduciary duties "are sometimes imposed on an ad hoc basis." *Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992). "If a person solicits another to trust him in matters in which he represents himself to be expert as well as trustworthy and the other is not expert and accepts the offer and reposes complete trust in him, a fiduciary relation is established." *Id.*

In the context of fraudulent concealment cases, these types of ad hoc fiduciary relationships are analyzed as "confidential" or "special trust" relationships.[3] This special relationship exists when "either because of superior knowledge of the matter derived from . . . overmastering influence on the one side, or from weakness, dependence, or trust justifiably reposed on the other side." *Mitchell v. Norman James Construction Co., Inc.*, 291 Ill. App. 3d 927, 684 N.E.2d 872, 880 (1997) (internal quotations omitted). "Factors to be considered in

---

[3] The *Burdett* case analyzed the existence of an "ad hoc" fiduciary relationship in the context of a claim for breach of fiduciary duty, not fraudulent concealment. However, the standard articulated by the Seventh Circuit in *Burdett* is very similar to the standard articulated for the "special trust" relationship in fraudulent concealment cases. *See Burdett*, 957 F.2d at 1381 ("The common law imposes [a fiduciary] duty when the disparity between the parties in knowledge or power relevant to the performance of an undertaking is so vast that it is a reasonable inference that had the parties in advance negotiated expressly over the issue they would have agreed that the agent owed the principal a high duty that we have described, because otherwise the principal would be placing himself at an agent's mercy.") In fact, the Seventh Circuit explicitly stated in *Wigod* that "the standard for identifying a special trust relationship is 'extremely similar to that of a fiduciary relationship.'" 673 F.2d at 571 (quoting *Benson v. Stafford*, 407 Ill. App.3d 902, 941 N.E.2d 386, 403 (2010)).

determining the existence of a confidential relationship include the degree of kinship of the parties; the disparity in age, health, and mental condition; difference in education and business experience between the parties; and the extent to which the allegedly servient party entrusted the handling of her business affairs to the dominant party, and whether the dominant party accepted such entrustment." *Id.*

Renee argues that she "had every reason to expect Pierson to act as her fiduciary." (Dkt. 41 at 12.) Notably, Renee has admitted that she never signed a letter of engagement with Pierson or Selden Fox, and has not presented any additional evidence that supply the indicia of a formal fiduciary relationship. As such, this Court will examine whether there is any evidence on the record to suggest that the Renee and Pierson had a special trust relationship that would create a duty to disclose Layer Saver's financial condition to Renee. According to Renee, this duty arose from Renee's long-standing friendship and business relationship with Pierson, and that "Pierson told Renee he accepted her trust and that she could trust him." (Dkt. 41 at 12.) Therefore, Renee argues, Pierson had a duty to disclose the financial difficulties and poor sales that Layer Saver had experienced, and the fees that Layer Saver owed Selden Fox. However, "[t]he special relationship threshold is a high one" and "state and federal courts in Illinois have rarely found a special trust relationship to exist in the absence of a more formal fiduciary one." *Wigod*, 673 F.3d at 571-72. As such, this Court finds that the Renee has not provided sufficient evidence to create a genuine issue of material fact regarding the existence of such a relationship. *See Wigod*, 673 F.2d at 571-72.

Although the fact pattern is similar to this suit, the *Burdett* case is distinguishable. In that case, the plaintiff was a highly successful sales representative; the defendant was a certified public accountant and professor of accounting at Northwestern University, who prepared the

plaintiff's income taxes and would often have lunch with the plaintiff to discuss business and personal matters. *Burdett*, 957 F.2d at 1378-79. When plaintiff's income "soared to $200,000" she sought advice from defendant "on how to minimize that tax bite." *Id*. at 1379. The defendant steered the plaintiff toward investing in several tax shelters, but failed to disclose that he was part owner of one of the tax shelters, that it was the first venture the proprietors of that tax shelter had engaged in, and that the units that plaintiff was investing in would be unmarketable. *Id*. When the "house of cards collapsed," the plaintiff lost $200,000, and sued the defendant for fraudulent concealment. *Id.*

Although the parties' relationship did not fall into one of the categories of relationships in which fiduciary duties are typically imposed (*e.g*, the client-lawyer relationship), the Seventh Circuit imposed such duties on the defendant on an "ad hoc" basis. *Id.* at 1381. The Seventh Circuit reasoned that the defendant had created a fiduciary relationship with plaintiff by "invit[ing] her to accept his advice with no questions asked or answered, in reliance on his professional and professorial status, on his insight into the arcana of tax shelter investments – a technical area about which she was ignorant – and on a continuing business relationship shading into a social friendship." *Id.* at 1381-82.

The key difference between this case and *Burdett* is that Pierson was not an expert in the relevant field, and there was not a significant disparity in abilities or education between Pierson and the Renee regarding the wisdom of loaning money to a company involved in Layer Saver's business. In *Burdett*, the defendant was a tax professor and CPA, who was hired by the plaintiff to file her tax returns, and was providing plaintiff with advice on tax shelters – an issue that fit squarely within his area of expertise and was within arguably within the scope of duties for which he was hired by the plaintiff. Here, Pierson is a CPA who was never hired by Renee in

*any* capacity, and the issue he was providing information about – loaning money to Layer Saver – was not an area of particular expertise for Pierson.

Renee seemingly argues that Pierson held himself out as an expert in Layer Saver's business because Pierson and Selden Fox were Layer Saver's accountants. However, this supposed area of expertise is not a "technical area about which [Renee] was ignorant" like the tax shelters in *Burdett*; there is no suggestion that Renee, who ran two independent businesses for over 20 years and had a bachelor's degree in finance, lacked the wherewithal to engage in the type of due diligence that would have uncovered the financial state of Layer Saver, or that she was beholden to Pierson's superior knowledge of the matters that would have allowed her to discover the truth. As such, this is not a case where a "person solicits another to trust him in matters in which he represents himself to be expert as well as trustworthy and the other is not expert," and, therefore, no ad hoc fiduciary duty or special trust relationship was formed between Pierson and Renee. *See Burdett*, 957 F.2d at 1381.

Moreover, the factors articulated in *Mitchell* also support a finding that Pierson did not owe Renee a duty to disclose Layer Saver's financial status. Pierson and Renee were friends who would sometimes discuss business and financial matters. They were not related, there is no evidence that they were particularly close friends, and there was no formal business relationship ever entered into by the parties. Thus, the "degree of kinship" does not support a finding of a special trust relationship. Nor is there any evidence that there is a significant "disparity in age, health, and mental condition" between Pierson and the Renee. Both parties are sophisticated business people, as Renee has successfully run two different business enterprises and has a degree in finance. As for "the extent to which the allegedly servient party entrusted the handling of her business affairs to the dominant party," Renee did not rely on Pierson to run the operations

of any of her businesses, and, in fact, did not even hire him to act as an accountant for her or her entities – the one role he was actually qualified to play. He would occasionally give her business advice, and while she may have trusted Pierson's advice and relied on him for this specific transaction, he did not work as an investment advisor and Renee did not entrust the handling of her business affairs to Pierson to the extent that they could be considered to have formed a special trust relationship. In short, Pierson did not have a duty to disclose any facts to Renee, and summary judgment is granted in favor of Moving Defendants on Count V to the extent that that cause of action relies on omissions of material fact.

### 3.    The Remaining Misrepresentations Are Not Statements of Fact

Moving Defendants next argue that they are entitled to summary judgment on Renee's common law fraud claim because the alleged misrepresentations are expressions of future events or opinions, which are not actionable. It is axiomatic that in order to "support an action for fraud, the alleged misrepresentation must be one of fact and not an expression of opinion. . . . Statements regarding future events are considered opinions, not statements of fact." *Prime Leasing v. Kendig*, 332 Ill. App. 3d 300, 773 N.E.2d 84, 92 (2002).

The majority of the misrepresentations alleged by Renee are opinions or expressions regarding future events. For example, statements that Layer Saver was a "fantastic investment opportunity" or was "expected to make over $1 million in income" are not actionable. (Dkt. 38 at 12.) In fact, having reviewed the record, this Court has identified only one actionable statement of fact. Renee has presented evidence that Pierson told her that information in the spreadsheet he showed her "reflected contracted for purchase orders from Heinz and Tropicana" but no such contracts existed at the time that statement was made. Assuming this statement was actually made, it is not a statement regarding future earning, but a representation of facts as they

existed at the time the statement was made, and, therefore, is an actionable statement of fact. Of course, if a jury finds that Renee was told that the document showed projected future earnings, as Moving Defendants contend, that would be a statement of opinion that could not support a cause of action for common law fraud. Renee's remaining allegations are statements of opinion that cannot support a cause of action for fraud. While it is a slender reed upon which to balance Renee's claim, it is sufficient to survive summary judgment, and Moving Defendants' motion will be denied on this basis.

### 4.    Pierson May Have Spoken With Reckless Disregard for the Truth

Finally, Moving Defendants argued that "Plaintiff's fraud claim fails because she has no evidence that indicates that Pierson knew that anything he may have said to Plaintiff regarding the potential bridge loan and/or Layer Saver was false." (Dkt. 38 at 13.) Inadvisably, Renee states in her brief that Pierson "never actually saw the Heinz or Tropicana contracts so he couldn't know for sure if they existed." (Dkt. 41 at 11.) However, Renee is not arguing that Pierson had actual knowledge that the contracts did not exist. Instead, Renee argues that Pierson recklessly disregarded the truth or falsity of his representation that Layer Saver had entered into contracts with Tropicana and Heinz.

Under Illinois law, intentional misrepresentations made with reckless disregard for their truth are falsity are sufficient to satisfy the scienter requirement for a fraud claim. *See Duhl v. Nash Realty, Inc.*, 102 Ill.App.3d 483, 429 N.E.2d 1267, 1274 (1981). The Illinois Supreme Court has held that, where a defendant has access to the necessary information to verify the accuracy of his statement, but fails to do so, it is reasonable to infer that the defendant's misstatements were made with reckless disregard for their truth. *See Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill.2d 179, 538 N.E.2d 530, 536-37 (1989) ("Even though

[defendant] claims this misrepresentation was due to inadvertence, our review of the record indicates that it was reasonable for the circuit court to conclude that [defendant], the party with exclusive control of the joint venture's books, records and financial affairs, either knowingly misrepresented the liabilities of the joint venture, or did so with a reckless disregard for whether the representations were truthful").

It is certainly possible that Pierson made the statements about the Tropicana and Heinz contracts without knowledge of their falsity or reckless disregard for their falsity, and honestly believed that Layer Saver was a good investment opportunity for Renee, who was his friend. As Moving Defendants have pointed out, Layer Saver had previously entered into trial contracts with those companies, and a reasonable jury might find that Pierson had sufficient evidence to believe that those contracts were in place. (Dkt. 53 at 11.)

However, that is not the only permissible inference that can be drawn from the record in front of this Court. Drawing all inferences in favor of the Renee, as the Court must on a summary judgment for summary judgment, a reasonable jury could find that Pierson, as the accountant for Layer Saver, had full access to, and control of, the relevant information necessary to verify the existence of the purchase contracts at issue. Considering that Selden Fox was allegedly owed approximately $20,000 in fees by Layer Saver at the time the statement was made, a fact finder could further infer that Pierson purposely avoided that information while he sought a lender for Layer Saver, in the hopes that any forthcoming loans would be used to pay some of Selden Fox's fees; certainly, Selden Fox had no hope of being paid if Layer Saver was no longer a going concern. As with the discussion above, this a narrow eye through which Renee must thread the evidence to support her claim, but on the record before the Court, we cannot say that it is impossible to infer that Pierson made the alleged misrepresentation with reckless disregard its

falsity.  Thus, Moving Defendants' motion will be denied as to this issue as well.

## CONCLUSION

For the reasons discussed above: 1) Plaintiffs' motion is granted as to Count III on the issue of liability, but is denied as to the amount of damages, which remains an issue for trial; 2) Plaintiffs' motion is denied as to Count VI; and 3) Moving Defendants' motion is denied on Count V on the issue of whether Moving Defendants Pierson and Selden Fox, by and through their agent Pierson, misrepresented that Layer Saver had purchase contracts with Heinz and Tropicana with reckless disregard for whether that statement was true or false, and is granted on all remaining issues on Count V.

**ENTERED:**

**DATED:** <u>July 21, 2015</u>

_____

Susan E. Cox

United States Magistrate Judge